UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| KRYSTINA M. SCOTT, JILLIAN SCOTT, | ) | |
| DENETRIA ADAMS, MICHELLE C. | ) | |
| HOFFIE and CHARLES J. HOFFIE, SR., | ) | |
| individually and on behalf of those similarly | ) | |
| situated, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | |
| | ) | |
| vs. | ) | 1:10-cv-971-SEB-TAB |
| | ) | |
| NOW COURIER, INC., d/b/a NOW | ) | |
| COURIER & MESSENGER, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

**ENTRY ON PENDING MOTIONS**

This matter is before the court on Plaintiffs' Motion for Conditional Certification

of FLSA Class and Certification of Indiana Class Under Fed. R. Civ. P. 23, Appointment

of Class Counsel and Judicial Notice [Docket No. 43].  Defendant has filed responses in

opposition to each of the motions.[1]  Based on the submissions by the parties and the

controlling legal precedent, we must **DENY** each of  Plaintiffs' motions, for the reasons

---

[1]  Plaintiffs have also filed motions for oral argument [Docket No. 61] and seeking an
order to strike Defendant's second notice of supplemental authority [Docket No. 75].  Defendant
has filed motions for oral argument [Docket No. 56] and requesting leave to file a surreply
[Docket No. 62].  We **DENY** the parties' motions for oral argument, finding that the briefing has
sufficiently informed the Court of the relevant facts and law to permit it to rule, and we **DENY**
Plaintiff's motion to strike.  We **GRANT** Defendant's motion to file a surreply because
Plaintiffs, by their own admission, included new facts and legal analysis in their reply to their
motions to certify the class and for collective action.

explicated below.

Plaintiffs are five former and current couriers[2] who currently work or have in the past worked for Defendant NOW Courier, Inc. ("NOW") as drivers and delivery persons. All five were/are drivers connected to NOW's Merrillville, Indiana office. They filed this lawsuit in June, 2010 on behalf of themselves and others similarly situated alleging that NOW misclassified them as independent contractors, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 207, *et seq*., and Indiana employment law protections. Plaintiffs ultimately seek a ruling that they are employees, not independent contractors, and as such they are entitled to minimum wage and overtime pay under FLSA and certain related benefits under Indiana law. For drivers working in Indiana, Plaintiffs also assert claims for illegal wage deductions, for declaratory and injunctive relief, for rescission of their claimed "contracts" and restitution of business expenses they paid individually by which NOW has been unjustly enriched.

At present, Plaintiffs are asking the Court to conditionally certify their FLSA claims as a collective action under 29 U.S.C § 216(b), which, they note, is a lenient standard that can be satisfied by a showing that plaintiffs and the putative FLSA class are all similarly situated. In addition, they seek class certification on their non-FLSA claims, maintaining that they have met each of the requirements of Rule 23, Fed.R.Civ.P., thereby entitling them to proceed as a class and to acquire class-based relief.

---

[2] Krystina M. Scott, Jullian Scott, Denetria Adams, Michelle C. Hoffie and Charles J. Hoffie, Sr.

Defendant objects to the appropriateness of either the FLSA collective action or the class action on the state law claims.  NOW maintains that each of the plaintiffs was an independent contractor, not an employee, and, given the nature of the contractual agreements entered into by Plaintiffs with NOW as well as their respective, disparate duties and conditions of employment, they are not employees as a matter of fact or law and that they were not and are not similarly situated employees as required by § 216(b) of FLSA and Rule 23 of the Federal Rules of Civil Procedure.  By NOW's estimates, sorting out the legal interests and entitlements of each of the putative class members would require a fact extensive, individualized analysis of each driver's working relationship with NOW, and such an individualized assessment defeats the purposes of a collective action, making it entirely impractical, if not impossible, to maintain.

## FACTUAL BACKGROUND[3]

The following summary of the facts comes from the discovery and stipulations reached thus far in this litigation.  NOW is an Indiana-based courier service that provides five types of diversified business services to its clients.  In terms of this litigation, the only relevant category of services provided by NOW to its clients is its transportation and

---

[3] We have drawn liberally from the parties' factual explications in their briefs, noting that most of the relevant facts underlying this case appear to us to be uncontroverted.  Whatever disagreements exist at this point pertain not so much to the material facts as to the legal significance and implications arising out of those facts.  We concede that certain factual disputes clearly do exist;  for example, NOW disagrees with Plaintiffs' assertion that all the putative plaintiffs in the proposed classes operated under the same contracts, citing Plaintiff Denetria's agreement as materially different that the other drivers' contracts.  Def.'s Resp. at 24-25.  But those disagreements do not stand in the way of our ruling on the pending motions, since we are not making a final merits determination at this time.

delivery services.  The five named Plaintiffs have all been employed in this capacity.

We are informed that approximately 70% of NOW's business comes from providing transportation and delivery services.  NOW operates out of offices ("hubs") located in five Indiana cities and in three major cities in states bordering Indiana (Cincinnati, Ohio; Louisville, Kentucky; and Chicago, Illinois).  NOW explains that it has opened these branch offices over time to accommodate its clients' needs in those areas. Indianapolis is NOW's largest office.  Merrillville, Indiana, where the Plaintiffs all work(ed), is NOW's sixth largest hub out of its eight branches.

NOW's clients emanate from three basic industry groups: financial/professional, trade/industrial and medical.  The delivery and transportation services provided by NOW are tailored to meet each client's particular business needs within each of the three market segments.  As one might expect, clients' needs vary within these categories and among competitors.  The amount and kinds of service NOW may be asked to provide on behalf of its varied clientele are essentially unlimited.

Each driver/delivery person ("Contractor") enters into a written contract with NOW at the outset of their employment relationship by which each agrees to perform transportation and delivery services as required by and in service of NOW's clients. Plaintiffs have each executed virtually identical, standard, individualized contracts with NOW,  which agreements lay out and describe their duties as independent contractors. (The agreement is referred to as the Independent Contractor Agreement, "ICA").  These contracts are not subject to individual negotiation by Plaintiffs throughout their terms of

4

employment on behalf of NOW.  NOW retains the right under these agreements to

set/change routes and to set compensation for the individual couriers, and to dictate certain

other terms relating to their business relationship.  Also included in these agreements are

non-compete clauses which prohibit the drivers from independently soliciting,

transporting or handling the business of any of NOW's customers who have been served

by that driver.  The basic, primary job duty for every driver is to provide the required

courier services required by NOW's customers.

Within the framework of NOW's overall operations, each driver is permitted to

determine the particular kind of delivery services he/she wishes to perform, contingent on

the amount of work available at any given time and the driver's own preferences

respecting his/her individual scheduling availability.  The amount of work available for

the drivers varies among the NOW locations.  Drivers typically use their own vehicles to

make the deliveries they have been assigned to make.

Generally speaking, a Contractor is permitted to choose between two kinds of

delivery work, assuming both are available at a given time: **routed work** (which includes

exclusive use and night distribution work) and **on demand work**.  The five named

Plaintiffs have performed both kinds of deliveries, but  worked as route skipper/back

up drivers primarily, which services are handled by fewer than 10% of the total fleet of

NOW Contractors.  The two types of work assignments available to NOW drivers are

described more fully as follows:

**ROUTED WORK**: As explained by the parties in their submissions, routed work

addresses a particular client's specific needs for delivery services, which generally allow

for little flexibility or variation on the part of the assigned courier in terms of the times of

delivery and the sequence of stops.  For example, a fixed route might be one involving

pharmaceutical drug deliveries to healthcare providers or deliveries to certain banking

clients who are obligated to process various financial transactions on a timely basis.  In

this category, the clients' business exigencies control the time and sequence of deliveries

by NOW couriers.

      As noted previously, Contractors are free to choose specific route assignments,

based on their availability.  Jobs are posted by NOW office personnel on a daily basis, at

least in the Indianapolis hub. At the branch locations where there is less business and thus

fewer client delivery opportunities, formal posting of job availability occurs less frequently.

Contractors can place bids on routes that they would like to be assigned to.

Frequently, the posted routes involve one or two-stop routes.  Sometimes route

assignments can be acquired through interactions/conversations among drivers, with

NOW's approval.  Other times an available route can be chosen by the Contractor when

he first begins work and signs the independent contractor agreement with NOW.

Contractors often will choose routes based on their own personal availability and

scheduling preferences.  NOW makes all route assignments to the drivers and those

assignments are subject to change by NOW as necessary, without the concurrence of the

individual drivers, though the drivers reserve the right not to accept any particular

assignments.

**ON-DEMAND WORK**:  These assignments reflect and respond to the individual clients' needs.  A Contractor can decide based on his/her availability on a particular day whether to work that day, and, if so, he/she notifies NOW of his/her availability to receive an assignment to a particular run, assuming work is available.  Each Contractor handling on-demand work decides when he/she is available to work and/or when he/she is no longer available on a particular day.  When the run is over, the driver decides whether to log out and go off duty.  Contractors performing routed work often take on-demand assignments in order to make extra money on a given day.  Branch-based contractors have fewer opportunities for such flexibility and for on-demand work in particular, compared to those working out of the major hubs.  A driver performing on-demand delivery work is typically compensated based on a percentage, but sometimes payments are made as part of the backup driver's fixed compensation.

**ROUTE SKIPPERS AND BACKUP DRIVERS**:  Contractors covering routed work for other Contractors who for some reason are unavailable on a given day to handle a particular route are referred to as "route skippers" and "backup drivers".  Backup drivers cover routed work and/or on-demand work that would otherwise be handled by other Contractors.  Drivers performing as backup/route skippers generally make themselves available by phone to the NOW dispatchers and, if called in to duty,  report to work for a specific period of time to handle the deliveries that would otherwise have been made by the unavailable Contractor.

Sometimes Contractors are paid a flat rate per week and are expected to remain

7

available to perform deliveries as needed; that rate of pay applies regardless of the

number of hours worked, though sometimes couriers are paid a percentage of the work

they perform, sometimes a variable minimum, and sometimes a combination of these

methods.  Route skippers/backup drivers typically are not paid to remain on call and

available; rather, they are paid only if they provide services during such times as they are

actually available.  However, in Merrillville, when route skippers/backup drivers are not

involved in making deliveries, they are free to pursue other activities of their choosing,

including personal business, family matters, to return to their homes, get something to eat,

or do nothing.  Certain deductions by NOW from a Contractor's pay are routinely made

to cover the costs of such things as cargo insurance and uniform rental; other business-

related expenses incurred by Contractors are not reimbursed by NOW and must be borne

by the drivers, including such costs as car maintenance, fuel purchases and auto

insurance.  Drivers work pursuant to their individual schedules and agreements and are

paid utilizing their own social security numbers.

Full-time drivers typically work between 40 and 50 hours a week, but the number

of hours worked can reach 60 per week.  No overtime is paid as such; drivers are usually

compensated for the number of hours worked with no premium rates for overtime hours.

Drivers are able to generate higher commissions if they acquire larger delivery vehicles

and thereby deliver more cargo, but apparently that happens rarely.

Plaintiffs note that NOW imposes some minimal job training requirements on its

drivers and directs that they all wear the same uniform along with displaying an ID badge.

Standard policies and procedures have been adopted by NOW and are in place and enforced in an effort to direct and control the quality of the drivers' job performance, including their demeanor with customers, and to ensure that the company brand is maintained through its delivery personnel.

The five named Plaintiffs, as we have previously mentioned, all worked exclusively out of NOW's Merrillville, Indiana, hub. NOW points out that several of these drivers (i.e., Jillian Scott, Krystina Scott and Mr. and Mrs. Hoffie) are all relatives of one another; Ms. Adams is the only named plaintiff outside their family circle. Plaintiffs contend that all NOW drivers have essentially the same job duties and are subject to common corporate policies, with the possible exception of the manner in which NOW calculates compensation policies. Each driver is required to have and maintain a good driving record and a valid license. No specific expertise, training or prior experience is required to qualify to work for NOW, and the individual drivers do not have responsibility for developing new business prospects on behalf of NOW.

Regarding the five named plaintiffs,[4] the following summaries provide more detailed descriptions of their duties and work histories:

---

[4] Bonnie Scott is named as an opt-in plaintiff. She also worked exclusively out of the Merrillville location operating under an independent contractor agreement with NOW. Bonnie Scott is Plaintiff Krystina Scott's mother and Plaintiff Jillian Scott's mother-in-law. The exhibits purported to be related to Bonnie Scott attached to her declaration (Exs. 45-47) per Plaintiffs' Memorandum of Law, page 5, do not relate to her, and we know no other factual details that specifically relate to her employment; thus the record before us as to Bonnie Scott is quite meager.

**<u>Krystina Scott</u>:**

- Term of employment: June 2007 to November 2009;

- Initially a route skipper primarily covering bank routes for NOW's main client in the Merrillville office;

- Usually worked 5 to 7 hours per day depending on the day; was required to be available between 7:00 a.m. and 7:00 p.m. on the days she worked;

- Transitioned into a backup driver doing "anything (NOW) needed" her to do, including personal errands;

- Her sister in law, Jillian, worked in the office when Krystina started to work for NOW and it was Jillian who told her she would be an independent contractor, but she believed over time based on her duties as the "go-to gal" she morphed at some point into an employee.

**<u>Jillian Scott</u>:**

- Twice executed driver contracts with NOW, the first period of employment lasting for approximately nine months, beginning October 23, 2006 until June 21, 2007, and the second beginning in October 2008 and lasting to the present;

- Between her stints as a driver, she served as the Merrillville office manager;

- Operated as a route skipper/backup driver during initial term of employment and was required to be available from 7:00 a.m. to 7:00 p.m. on the days she worked; she was paid $600.00 per week;

- When she staffed the Merrillville office, her supervisor was Jeff Powell, and she performed typical office tasks, but on occasion she took assignments to handle routed work in the afternoons, for which she received additional compensation; she could decline these assignments at her discretion;

- She voluntarily left her office manager post to return to being a full time driver so she could get away from being on call 24 hours a day and from missing time with her family;

- She routinely makes deliveries of medications for another courier company on weekday mornings, and is the contact person for another delivery company,

10

Prestige, with its independent contractor drivers.  As the Prestige contact person, she often enlists certain of the named Plaintiffs in this action to drive for that courier company.

- Obtained a Security Threat Assessment certification to enhance her qualifications to perform certain kinds of deliveries and to earn extra money;  she handles these deliveries along with her regular tasks, whenever she chooses to do them.

- Purchased a specially made van to handle an Omnicare route for NOW, which she uses only for work purposes, on behalf of NOW as well as other couriers.

**Denetria Adams:**

- Began employment with NOW at the end of May 2009, working initially as a route skipper/backup driver during the days;

- Has handled primarily routed work throughout her employment with NOW;

- Is compensated on a percentage basis (26%) for the work she performs;

- When at some point she tired of waiting around until work became available and she was deployed to make deliveries, she bid on and had assigned to her certain specific route assignments, which schedule allowed her more reliable work and more stable compensation levels;

- She covers a payroll route in the mornings and a bank route in the afternoon; occasionally covers weekend routes for other NOW drivers;

- Has requested from NOW other opportunities to make more money, but declines to take Monday delivery assignments because she reportedly was losing money.

**Mrs. Hoffie:**

- Contracted with NOW from October 2007 to July 2009, providing services for both NOW and another delivery service; eventually she switched in full time work only for NOW;

- Worked as a route skipper/backup driver until she switched to a route driver in May 2009 in order to decrease her workload;

- Handled bank routes, payroll routes, Omnicare routes and medical routes;

11

- Workload changed over time, "every day was different" with individualized experiences;

- To make extra money, she occasionally accepted additional weekend or evening routes, though she would sometimes decline work offered to her by NOW, and such refusals resulted in no repercussions from NOW.

**Mr. Hoffie:**

- Contracted with NOW from October 2007 until February 2009;

- Was a route driver for all but two weeks of his employment with NOW, during which interlude he was a route skipper/backup driver;

- Primarily involved in bank deliveries in the Merrillville area;

- While employed with NOW, purchased a more fuel efficient vehicle to increase his profits;

- Utilized a U.S. Postal Service flag on his delivery vehicle in an effort to maximize his efficiency.

## APPLICABLE  LEGAL  PRINCIPLES

A lawsuit brought pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, invokes the Court's federal question jurisdiction under Title 28 U.S.C. § 1331. Sections 206 and 207 of Title 29 proscribe, respectively, the payment of wages by any employer to any employee that fall below minimum wage levels set by law, and requiring employees to work in excess of the forty hours per week without receiving overtime compensation consistent with the statutory minimum levels. Section 216(b) authorizes a cause of action in damages for violations of §§ 206 and 207, providing in applicable part as follows:

> An action to recover the liability prescribed [herein] may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Plaintiffs have framed their complaint as a collective action claim to recover unpaid overtime and minimum wages under the FLSA to which they believe they are entitled along with legal and equitable relief on claims arising under Indiana law which they seek permission to assert as a class action.  They cannot recover on their claims under this statute unless the Court is persuaded that they are, under the facts of their case and the applicable principles of law, employees rather than independent contractors.  "Only employer-employee relationships fall under the FLSA."  Solis v. Intern. Detective and Protective Service, Ltd., __ F.Supp.2d __, 2011 WL 2038734, at *7 (N.D.Ill. May 24, 2011).  "An 'employee' is defined as 'any individual employed by an employer' . . .  and 'employ' means to 'suffer or permit to work.'"  Id. (quoting 29 U.S.C. §§ 203(e)(1) and 203(g)).

Plaintiffs contend that, rather than independent contractors as NOW has characterized them, they are actually employees of NOW.  This is, of course, the major contested issue between the parties, because, as noted above, unless Plaintiffs can establish that they were/are employees of NOW, no FLSA benefits are available to them and their state law claims would collapse as well.  Whether a particular individual or individuals are employees who are entitled to the FLSA protections as opposed to being

13

independent contractors turns on the outcome of what is referred to as the economic realities test, which is intended to elucidate whether and, if so, to what extent employees are actually "dependent upon the business to which they render service." Bartels v. Birmingham, 332 U.S. 126, 130 (1947); see also, Sec'y of Labor, U.S. Dep't of Labor  v. Lauritzen, 835 F.2d 1529, 1534 (7th Cir. 1987).  Dependence in the FLSA context equals employment status.[5]

## CONDITIONAL CERTIFICATION OF COLLECTIVE ACTION

What Plaintiffs seek at this point is not a determination on the merits, but instead a conditional certification that a single (collective) action among similarly situated employees will be preferable and more efficient in light of the existence of common issues of law and fact among them that will, if proven, establish NOW's liability.  Bunyan v. Spectrum Brands, Inc., 2008 WL 2959932 (S.D. Ill. July 31, 2008).  To prevail on their request for a collective action, plaintiffs must make a threshold showing that they are similarly situated to the employees on whose behalf they are seeking to pursue this claim. Mares v. Caesars Entertainment, Inc., 2007 WL 118877, at *2 (S.D. Ind. Jan 10, 2007); Lallathin v. Ro Ro Inc., 2010 WL 2640271, at *1-*2 (S.D. Ind. June 28, 2010).  "In

---

[5]  In the Seventh Circuit, courts consider the following six factors in assessing the economic reality of the working relationship: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.  Lauritzen, 835 F.2d at 1534-35.

FLSA cases based on misclassification claims, the precise duties and tasks performed by the employees are directly at issue." Marshall v. Amsted Industries, Inc., 2010 WL 2404340, at *7 (S.D. Ill, June 16, 2010).

We have noted several times previously, but repeat here nonetheless, that a conditional certification does not require the district court to adjudicate the merits of plaintiffs' claims. The effect of a conditional certification of a collective action simply opens the way for notice to the proposed class of the pending action so other similarly situated putative plaintiffs have an opportunity to opt-in as parties to the litigation.

LEVEL OF SCRUTINY:   In determining whether the claimants are similarly situated to those whom they seek to include in their collective action, courts in our circuit, generally speaking, must apply a two-part test. At the first stage, if the court makes a preliminary, conditional determination that the members of the putative class are similarly situated, plaintiffs are authorized to give notice to the potential class members permitting potential class members to opt-in. This phase is commonly referred to as the "notice stage" and the determinations by the Court are based on the pleadings and any accompanying affidavits, etc. In situations where a conditional certification has been made and most or substantial amounts of discovery have been completed and the case is nearly trial ready, a defendant may move to have the conditionally certified class decertified, based on a showing that the members of the class are not similarly situated. When the conditional certification of collective action determination follows discovery which suggests that a certification would not be appropriate, the court "can collapse

15

the two stages of the analysis and deny certification outright." Purdham v. Fairfax
County Pub. Schs., 629 F. Supp. 2d 544, 547 (E.D.Va. 2009); Blaney v. Charlotte-
Mecklenburg Hosp. Authority, 2011 WL 4351631, at *3 (W.D.N.C. Sept. 16, 2011).  At
this in-between stage, which is where the parties find themselves in the case before us,
when substantial discovery has been conducted but is not yet complete, an intermediate
level of scrutiny is appropriately applied by the Court.  See, e.g, Bunyan v.
Spectrum Brands, Inc., 2008 WL 2959932, at *3-*4 (S.D. Ill.  July 31, 2008).

We believe an intermediate level of scrutiny is indeed appropriate here.  Despite the
parties' seeming initial disagreement on this point, their briefs filed on the issue of the
whether a conditional certification is appropriate based on the named plaintiffs being
similarly situated to the putative claimants acknowledge that because substantial discovery
has been conducted and that our decision on the pending motion should take those matters
into account.  The parties make clear that their discovery, though significant, is not yet
complete; our decision therefore reflects the factual record as it currently exists..

Plaintiffs request conditional certification of the following FLSA Class:

> All individuals who work or worked as drivers for NOW
> Courier, Inc. at any time within the last three years preceding
> the Court's Order approving the conditional certification of the
> collective action through the present, who drove a vehicle with
> a gross weight of less than 10,001 pounds,  and who were classified
> as independent contractors.

NOW asserts that Plaintiffs' evidence fails to support a finding that the putative
members of such a class are similarly situated in large part due to the fact that the

16

evidence thus far adduced relates only to events and drivers who have operated out of the Merrillville hub.  As such, the evidence does not reflect company-wide policies and practices in the seven other NOW locations so as to relate to "all individuals who work or worked as drivers for NOW..." as independent contractors during the specified period. Further, according to NOW, the Merrillville location is relatively small – five other hubs are larger, with the Indianapolis hub being the largest in the NOW system.  According to NOW, since its branch managers have considerable discretion in overseeing the operations at each hub, there is no basis on which the Court could reasonably extrapolate from the Merrillville practices and procedures to all other NOW contractors.

NOW further contends that Plaintiffs' attempt to demonstrate that NOW treated all of its drivers the same is undercut by Plaintiffs' own deposition testimony and experiences with NOW, noting that each driver's daily tasks differ depending on a variety of factors, such as client requirements, driver and route types,  the location from which the driver is dispatched, and the schedules drivers select on a given day.

NOW disputes as well Plaintiffs' claim that all NOW drivers receive expansive training under NOW's auspices and direction, noting, for example, that none of the named plaintiffs participated in the referenced four-day training allegedly required of all drivers.  Other allegedly standardized requirements Plaintiffs claim to have had imposed by NOW on them and the other drivers (i.e., the NOW "Ten Commandments") were apparently not uniformly required of the named Plaintiffs or others.  Further, whether those standards were made applicable to all drivers in other NOW locations has simply not

been established in the evidence adduced by Plaintiffs.

We find disingenuous Plaintiffs' assertions that NOW controls the manner and means of deliveries by its drivers when, in so stating, they fail to acknowledge the substantial extent to which the clients' individual scheduling preferences and the demands for delivery services by clients of NOW control. The evidence thus far adduced reveals that the individual drivers have considerable autonomy and independence in choosing the kinds of routes they wish to be assigned and the schedules they want to work. When the amount of work available at a NOW location ebbs and/or when drivers choose not to be on duty at certain times, NOW makes no attempt to control drivers' off hours, even allowing them to work for other presumably competing delivery services. These factors underscore the individualized nature of Plaintiffs' contractual arrangements and compensation entitlements, and thus do not lend themselves to class-wide relief.

Plaintiffs rejoin that they have, in fact, established a "factual nexus" connecting themselves to all other NOW drivers, including but not limited to those operating out of NOW's Merrillville, Indiana, location. In support of this contention, Plaintiffs cite the fact that all NOW drivers execute virtually identical agreements containing common terms relating to their job responsibilities and compensation. In broad-brush fashion, they attempt to substantiate this claim by characterizing the common, shared job responsibility among all drivers as providing courier services to Defendant's customers on behalf of NOW. That is plainly true, but it hardly describes the varied ways in which NOW contracts both with its clients and its drivers to deliver those services. Such a description

18

fails to illuminate the ways and extent to which NOW allegedly maintains substantial controls over its drivers' performance, or deprives them of opportunities to increase their profits or reduce their losses based on restrictions imposed by NOW and NOW's control over the rates charged to its customers.  Nor is it clear how, by reserving the right to assign routes if the individual drivers' preferences cannot be honored in some particular context, NOW has acted in a uniform manner to the detriment of all the drivers thereby entitling them to common reparations.

NOW has rebutted  many of Plaintiffs' factual assertions.  Importantly, the sworn statements of the individually named plaintiffs reveal factual inconsistencies on these and other highly significant issues.  Some drivers, for example, apparently were allowed to choose their preferred routes and work schedules, others did not.  Some of the Plaintiffs were permitted to, and did work for competing courier services during the times they were under contract with NOW.  Some drivers were permitted to develop their own delivery routes; others had to yield to the needs of individual customers and NOW's obligation to get deliveries made when time is of the essence.  The imposition of monetary penalties and discipline on malfeasant drivers, including placement on performance correction plans, was a matter left to the respective branch managers and thus not orchestrated in any standardized way by NOW applicable to all its locations and drivers. Similarly, we have been informed that compensation rates for particular routes also varied from branch to branch, and, while some drivers were paid weekly, not all were.  Other details varied as well in terms of each Plaintiff's employment requirements, such as

whether participation was mandated in centralized training and educational programs, and drivers' use of their own vehicles.  Even the number of work hours allegedly required of each driver on a weekly basis differed among the named Plaintiffs.

Beyond these many dissimilarities among the named plaintiffs, we are left to wonder whether similar variations exist(ed) among the entire complement of NOW drivers throughout all their eight hubs.  We simply do not know such basic facts as the number of drivers operating out of the Merrillville hub, the numbers in each of the other locations, and the kinds of delivery services performed at each.  It is not clear, assuming some drivers should be considered and treated as employees rather than as independent contractors, whether that would be true of all of them, or, stated otherwise, whether there are some drivers under contract with NOW who are, based on the facts and law relating to their relationship with NOW, appropriately and legitimately designated as independent contractors.  The record falls far short of providing the necessary factual basis on which this determination can be made by the court.  We simply have no idea who is similarly situated to Plaintiffs, assuming they are similarly situated to one another, about which, as we have previously noted, we also have our doubts.

Plaintiffs' reliance on broadly general and vague terms to try to show the similarities among themselves and all the other NOW drivers undermines the succes of their efforts.  For example, their reference to "common job requirements" as nothing more than NOW's expectation that its drivers satisfy NOW's clients' delivery requirements rings hollow; such a description tells us virtually nothing in terms of the standardized procedures in place

to control the drivers.  Similarly, Plaintiffs' reliance on the alleged company-wide policy

and practice requiring drivers to be courteous to the clients, to wear their uniforms and

display identification badges, and make timely deliveries does not suggest the kind of

pervasive, centralized direction and control of "nearly every part of the drivers' work

days" (Pls.' Mem. at 3)  and performance that are indicative of an employer-employee

relationship as opposed to an independent contractor relationship.  Plaintiffs' terminology

in asserting that all drivers were required "*at least occasionally* (to) work ... for more than

40 hours per week without overtime pay" and "*at least on some occasions* earned less

than minimum wage," and "*primarily earned compensation* for either or both routed or

on-demand work" is telling in its vagueness and lack of specificity. (Pls.' Corrected Reply

at 11) (emphasis added).

Plaintiffs have also failed to address the nature and significance of the roles of the

individual branch managers and the discretion allowed them by NOW to set locally the

terms of driver pay and compensation rates, conditions leading up to driver discipline and

termination, the permission given by them to NOW drivers to work for other courier

services, if NOW's demands for drivers ebbs from time to time, and the control exercised

by the branch managers over work hours generally at each location, the routes assigned

and available, and the hiring decisions regarding each kind of driver.  Such broad

discretion allocated among at least eight branch managers (we assume each branch has its

own manager) surely would produce highly diverse performance standards among them,

which clearly undercuts any claim that all the NOW drivers are similarly situated to one another,

among themselves and in terms of their employment relationships with NOW.

Thus, we must and do conclude that Plaintiffs' attempt at this juncture to make the required showing justifying a preliminary, conditional certification authorizing a collective action has fallen far short of the applicable legal requirements.  There is a clear lack of evidence indicating that all the NOW drivers are or were similarly situated to the named Plaintiffs and to one another.  Accordingly, the Court denies the motion for a conditional certification of a FLSA class.

## CLASS CERTIFICATION OF STATE LAW CLAIMS

With regard to Plaintiffs' request for class certification of their Indiana claims, pursuant to Rule 23, Fed.R.Civ.P., they propose approval of the following class:

> All individuals who work or worked as drivers for Now Courier
> Inc. in Indiana at any time during the period from June 16, 2008
> to the present and who were classified as independent contractors.

Invoking the familiar prerequisites to certification of a Rule 23 (a) class – numerosity, commonality, typicality and adequacy of representation – as well as the requirements of Rule 23(b)(3) that common question of law or fact predominate over questions affecting individual members of the class and that there be a finding that a class action is the superior method for resolving the controversy, Plaintiffs request that the Court in its discretion certify the class defined above to pursue their claims of liability based on state law.

In support of this request, the Plaintiffs assert that the proposed class is comprised of "several hundred members;" that the common factual issue among them and the

22

putative class members is whether NOW misclassified them as independent contractors

rather than employees, thus giving rise to the common legal issue that they are employees

rather than independent contractors which, under Indiana law, entitles them to relief.  The

named plaintiffs assert that their claims are typical of the claims of the class at

large in that all suffered similar injuries by virtue of NOW's policies and practices and all

arose in the same ways.  Plaintiffs and their counsel also assert that they are capable of

providing adequate representation to the class, that there are no existing conflicts of interest

or deficiencies in competency or experience  nor is there any other self interest that would

undermine their ability to advance the interests of the putative class plaintiffs.  Plaintiffs

also argue that a class action is the superior means of resolving these claims because such

an approach will generate benefits of efficiency and fairness, and allow for a single

determination of key legal issues, including liability and damages.

   We are not persuaded that certification of a class is appropriate or necessary based

on the same deficiencies outlined above with regard to Plaintiffs' request for conditional

certification of a FLSA class.  In the same ways and extent they have failed to establish they are

similarly situated to all the Indiana drivers under contract with NOW during the stated

period of time, their efforts to establish entitlement to class action certification also falter.

Plaintiffs must show, for example, under the commonality requirement specified in Rule

23(a)(2), Fed.R.Civ.P, that they will be able to prove that all the Indiana drivers were

misclassified as independent contractors. Given the myriad of dissimilarities among all

the drivers as detailed above given their respective arrangements with NOW, or such potential

dissimilarities, the Court's ability to award class based relief, should Plaintiffs prevail on their claims of liability and entitlement to awards of damages, will be unreasonably tested rendering the assigned task at best complex and inefficient, if not judicially impossible.

We are prepared to concede that there may conceivably be some sub-groups of NOW drivers composed of sufficiently homogeneous groups to allow a finding that they are similarly situated to one another.  No such subsets have been proposed by Plaintiffs, however, and we have no independent factual basis on which to propose how they might exist. We will leave that to the advocates, if they choose to analyze their discovery in that light and reassert an entitlement to the certifications sought here, taking take into account the Court's extensive analysis and discussion, *supra*.

## CONCLUSION

For the reasons outlined above, Plaintiffs' Motion for Conditional Certification of FLSA Class and Certification of Indiana Class Under Fed.R.Civ.P. 23 [Docket 43] is DENIED; and Plaintiffs' Motion to Strike [Docket No. 75] and both parties' motions for oral argument [Docket Nos. 56 and 61] are also DENIED.  Defendant's Motion for Leave to File Surreply [Docket No. 62] is GRANTED.

IT IS SO ORDERED.

Date:   _____03/29/2012_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

24

Copies to:

Robert L. Browning
SCOPELITIS GARVIN LIGHT & HANSON
rbrowning@scopelitis.com

Andrew J. Butcher
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
abutcher@scopelitis.com

Susan M. Coler
HALUNEN & ASSOCIATES
coler@halunenlaw.com

Christopher J. Eckhart
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
ceckhart@scopelitis.com

O. Adedoyin Gomih
LAW OFFICES OF ADEDOYIN GOMIH, LLC
doyin@adedoyingomihlaw.com

James H. Hanson
SCOPELITIS GARVIN LIGHT HANSON & FEARY PC
jhanson@scopelitis.com

Trent A. McCain
MCCAIN & WHITE, P.C.
Trent@McCainWhite.com

Shawn J. Wanta
Baillon Thome Jozwiak Miller & Wanta LLP
sjwanta@baillonthome.com